## THE QUEEN ELIZABETH.

### FULTON v. HOLMES et al.

(Circuit Court of Appeals, Second Circuit. April 16, 1903.)

### Nos. 142, 143.

1. COLLISION—SAILING VESSELS CROSSING—INSUFFICIENT LOOKOUT.

A finding that a schooner was in fault for a collision with a crossing vessel in the night affirmed, where it appeared from the evidence that she was the burdened vessel, that through the inefficiency of her lookout she failed to see the lights of the other vessel until she was only three or four lengths distant, and then attempted to cross ahead of her, in violation of article 22 of the international navigation rules (Act Aug. 19, 1890, 26 Stat. 327 [U. S. Comp. St. 1901, p. 2870]).

2. SAME—DEPARTURE FROM RULES—WHEN JUSTIFIED.

Under article 27 of the international navigation rules (Act Aug. 19, 1890, 26 Stat. 327 [U. S. Comp. St. 1901, p. 2871]), which provides that in obeying and construing the rules "due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger," a privileged vessel cannot be charged with fault for changing her course where an immediate collision appears inevitable if her course is maintained, and the danger is due solely to the fault of the other vessel.

3. SAME—ACTION IN EXTREMIS.

Where the master of a vessel, who is a navigator of experience and good judgment, is confronted with a sudden peril, caused by the action

¶ 3. See Collision, vol. 10, Cent. Dig. §§ 225, 227.

of another vessel, so that he is justified in believing that collision is inevitable, and he exercises his best judgment in the emergency, his action, even though unwise, cannot be imputed to his vessel as a fault.

**4. SAME.**

A ship *held* not chargeable with contributory fault for a collision with a crossing schooner in the night because of her change of course, although she was the privileged vessel, where such change was not made until immediately before the collision, when the vessels were within a few hundred feet of each other, and when it became apparent that the schooner was attempting to cross ahead, in violation of the rules.

Appeals from the District Court of the United States for the Eastern District of New York.

In Admiralty. Cross-libels for collision.

This is an appeal by both parties from the decree of the District Court for the Eastern District of New York, entered August 17, 1901, dividing the damages and directing that the claimant of the ship the Queen Elizabeth recover of the owners of the schooner Percy Birdsall the sum of $1,451.52. The decision of the District Court is reported in 100 Fed. 874.

Frank D. Sturges, for Holmes.

Wilhelmus Mynderse, for the Queen Elizabeth.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. The facts are stated at length in the opinion of the district judge. It is unnecessary to repeat them here. The principal controversy upon the facts has relation to the direction of the wind at the time of the collision. After a careful review of the testimony the district judge reached the conclusion that it was southwest, that the Birdsall was sailing free and that the Queen Elizabeth was sailing closehauled, the wind being sufficiently forward of her beam to warrant this adjustment of her sails. He also found that the Birdsall was headed northeast, or northeast by east, and that the Queen Elizabeth was on the port tack, heading northwest by west half west. Although the testimony as to the direction of the wind is contradictory and inconclusive we are inclined to the opinion that the conclusion reached by the district judge is supported by a preponderance of testimony or, as he aptly observes, by "a narrow margin of evidence." The vessels were then on crossing courses and were approaching so as to involve risk of collision.

Articles 17, 21 and 22 of the international regulations for preventing collisions at sea (Act Aug. 19, 1890, c. 802, 26 Stat. 320 [U. S. Comp. St. 1901, p. 2863]) were, therefore, applicable. Act Dec. 31, 1896, 29 Stat. 885. Article 17 provides that "a vessel which is running free (Birdsall) shall keep out of the way of a vessel which is closehauled" (Queen Elizabeth) and that "a vessel which has the wind aft (Birdsall) shall keep out of the way of the other vessel" (Queen Elizabeth). Article 21 provides that where "one of two vessels [Birdsall] is to keep out of the way, the other [Queen Elizabeth] shall keep her course and speed." Article 22 provides that the vessel whose duty it is to keep out of the way (Birdsall) shall, if possible, avoid crossing ahead of the other.

The facts being found as stated there can be no controversy as

to the duty which the law imposed upon the vessels. It was the duty of the Birdsall to keep out of the way. It was the duty of the Queen Elizabeth to keep her course and speed. Both vessels violated their duty. The Birdsall did not keep out of the way. The Queen Elizabeth did not keep her course. We have no doubt as to the negligence of the Birdsall. If her crew had been competent, alert and watchful they certainly would have seen the ship's red light before it was "right abreast" on the "starboard beam." Danger of collision was then imminent, the time was, probably, less than two minutes, the distance less than four lengths. The evidence that the ship's lights were burning brightly is overwhelming and if the lookout had been attentive he could have seen the red light twenty minutes prior to the collision and when the ship was miles distant. His failure to do this on a clear night was unquestionably a fault.

The Birdsall's attempt to cross ahead of the ship was a violation of article 22, but if this were her only error we should be inclined to excuse it as a maneuver which seemed to offer the best chance of escape from a desperate situation. She is not, however, entitled to the benefit of the rule which excuses mistakes made in the excitement of the moment for the reason that the fault was attributable to her own previous neglect. The action of the ship in porting her helm immediately before the collision presents an interesting question which was decided against the ship in the District Court. The opinion says:

"As the vessels approached each other on crossing courses, the schooner put up her helm and went off somewhat. Perhaps it would have been better if she had luffed, but it is probable that she would have crossed the bow of the ship, had not the latter put her helm up, which caused her to go to starboard and follow up the schooner's course and strike her on the starboard quarter. It would not be profitable to discuss the angle of collision or whether the ship's maneuver was in extremis. Doubtless her helm was put up in expectation and to lessen the force of the contact, but it was a mistake which a master of good judgment should not have made, even under the apprehension of the threatened collision. The ship simply pursued the schooner, and the collision was of greatly increased probability. The ship should have kept her course, or, if action seemed imperative, she should have put her helm down and headed up to the wind. It is the disposition of courts to hold that the privileged vessels should keep their course, or furnish good reason for not doing so. In this case the ship did not keep her course, and did something tending toward, and not away from, collision."

In this finding we are unable to concur. Unquestionably the failure of the ship to keep her course was a violation of the strict letter of article 21, but we think that the omission to observe the rule was justifiable under the qualifying language of article 27 and that, if it were an error, it was made in extremis. Article 27 provides that in obeying and considering the steering and sailing rules "due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." In other words, a vessel should not adhere obstinately to the rules when disaster can be avoided by a departure from them. As was said in The Elizabeth Jones, 112 U. S. 514, 524, 5 Sup. Ct. 468, 473, 28 L. Ed. 812.

"There is no idea appertaining to keeping a course which justifies holding to it in such a way as to bring on a peril. The only principle inherent in it is to so act as to enable the other vessel, on 'whom the duty rests, to adopt with success means of getting out of the way."

When the master of a vessel is confronted with a sudden peril, caused by the action of another vessel, so that he is justified in believing that collision is inevitable and he exercises his best judgment in the emergency, his action, even though unwise, cannot be regarded as a fault. "The judgment of a competent sailor in extremis cannot be impugned." The Oregon, 158 U. S. 186, 204, 15 Sup. Ct. 804, 39 L. Ed. 943. It is the duty of the court, as far as possible, to place itself in the position of the master and to endeavor to interpret the rules of navigation in the light of the perils and perplexities which surrounded him at the time—the impending danger, the excitement of the moment, the necessity for immediate action. Where a navigator of experience and good judgment acts, in such circumstances, his action, if within the limits of reasonable judgment and discretion, cannot be imputed to his vessel as a fault. If he acts upon his best judgment at the time it is sufficient, even though subsequent judicial investigation may show that he might have chosen a more prudent course. A master who the next moment may be sinking with his ship and crew cannot be expected to display the utmost coolness and deliberation. The Dimock, 23 C. C. A. 123, 77 Fed. 226; The City of Augusta, 25 C. C. A. 430, 80 Fed. 297; The Iron Chief, 11 C. C. A. 196, 63 Fed. 289; The Havanna (D. C.) 54 Fed. 411; The Robert Healey (D. C.) 51 Fed. 462.

Tested by these rules how stands the case of the Queen Elizabeth? The master was a sailor of unusual experience, having been a master since 1874, commanding sailing ships and steamers. He saw the Birdsall's light when it was several miles distant and observed it carefully until it was near at hand. Knowing that his was the privileged vessel he held his course in the expectation that the Birdsall would make some effort to keep out of the way. He ported only at the last moment when it was apparent that the Birdsall was doing nothing and when a collision seemed certain. The distance between the vessels when the ship ported is variously estimated from 125 feet to 700 feet, the time from 30 seconds to a minute. It is clear, whichever theory is adopted, that the time was too short for accurate calculations or cool and deliberate action. Whatever was done must be done quickly. The master was compelled to decide at once whether to hold his course and run the risk of sinking both vessels, by striking the schooner at right angles, or put his helm up and thus lessen the effect of the impact. In view of the comparatively slight damage, aggregating about $7,000, how can it be said that his judgment was at fault? How can it be said that the collision would have been avoided had he held his course? Counsel for the Birdsall has introduced some carefully prepared and ingenious calculations to prove that the vessels were not in extremis when the ship ported, but these calculations are based upon disputed and, in some instances, improbable hypotheses. It should be remembered that the night was dark and that it was impossible for the ship to know exactly how the schooner

was heading, her distance away, the position of her helm, her speed, or what maneuver she would attempt. Assumptions based upon observations made at such a time must needs be inaccurate. The logic of the situation leads to but one conclusion. The schooner's heedless conduct placed the ship in a position of extreme peril. Until confronted by this peril the ship's navigation had been faultless. If, thereafter, she erred in judgment, and that she did so is by no means established, the error was at a time when mistakes of judgment are excusable.

The decree of the District Court, holding the Queen Elizabeth liable, is reversed with costs of this appeal and the cause is remanded with instructions to enter a decree holding the Percy Birdsall solely in fault.