## THE GULFSTAR.

### SUN OIL CO. v. S. S. GULFSTAR et al.
### No. 161.

District Court, E. D. Pennsylvania.
May 15, 1940.

Krusen, Evans & Shaw and Leslie C. Krusen, all of Philadelphia, Pa., and Duncan & Mount, by H. W. Dieck, of New York City, for plaintiff.

Burlingham, Veeder, Clark & Hupper, Eugene Underwood and Chauncey I. Clark, all of New York City, and Shields, Clark, Brown & McCown and Samuel B. Fortenbaugh, Jr., all of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This is an admiralty suit tried before me without a jury.

A libel was filed to recover for damages suffered by the motor ship Sun in a collision with a steam tank vessel, the Gulfstar, on July 16, 1937, off the east coast of Florida, approximately 15 miles northeast from Fowey Rocks Light, in the neighborhood of 1 a.m. Each party claims that the collision and consequent damage occurred solely through the fault of the other. In addition, the claimant-respondent contends that even if it were negligent, no liability rests upon it because negligence of the libellant's ship contributed to the collision.

Some essential facts are not in dispute. They are:

The collision happened on a clear, dark, moonless night, in a smooth sea, and with a gentle breeze blowing. Each ship displayed standard navigation lights—range lights, masthead lights, green starboard and red port lights. Up to a few minutes before the collision the Sun's course was 220° true—approximately southwest. The course of the Gulfstar was one degree true—almost directly north. The Sun was running at a speed through the water of between 11 and 11½ knots, and the Gulfstar at about 9.8 knots. To the east of the Gulfstar and about 250 yards away was a submarine, the S–30, and on the starboard side of the S–30 was the submarine S–1, about 500 yards away from and broad on the bow of the S–30—both maintaining northerly courses approximately parallel to that of the Gulfstar, and both running on the surface and equipped with standard running lights.

The Sun and the Gulfstar were on crossing courses, wherefore, under the applicable International Rules of Navigation, the Sun was the privileged and the Gulfstar the burdened vessel, the latter having the former to her starboard.

There was a flat and outright contradiction between the respective versions of the two boats relating to the events immediately preceding the collision.

Without entering upon detail, their two stories may be summarized thus:

Sun's version: At 1 a.m. (Sun's time) the Gulfstar, then one mile or more distant from the Sun, crossed the latter's course. At 1:01 a.m., the Gulfstar was observed by Hodgson (Second Officer of the Sun) to be slowly changing her course to the right. At 1:02 a.m., the Gulfstar opened her red (port) light. At that time the Gulfstar was bearing about one point on the starboard bow of the Sun and heading for her starboard side. The Sun's wheel was ordered hard right and she blew a signal of one blast on the whistle. The distance between the vessels was then about 3/4 of a mile.

The Gulfstar, instead of continuing her right swing, steadied on. Hodgson, observing this, ordered the Sun's engines full astern—this at 1:03 a.m. The Sun's wheel was kept at hard right. The vessels approached each other. Just before the collision the Gulfstar was again observed to swing hard right. At 1:05 a.m. the bluff of the Gulfstar's port bow struck the port side of the Sun, somewhere abreast of number one tank. The angle of impact was one point (11-1/4°) or less. The port sides of the two vessels raked along each other until there was contact between both sterns, after which the vessels cleared each other. All times given are Sun's time.

Gulfstar's version (all times mentioned are S–30 time): The collision happened at 1:14 a.m. At 1:09 a.m. the Gulfstar changed her course to the right to avoid crossing the Sun's course and to pass astern of her. Her maneuvering was limited by the necessity of avoiding heading over too far and crossing the course of the S–30, which had been abreast of her at 1:07 a.m. but which had gradually fallen back, since the S–30 was making only 5½ knots and approximately paralleling the Gulfstar's course—about 250 yards east of her. At that time, 1:09 a.m., a distance of about two miles separated the Sun and the Gulfstar, and the latter sounded a one-blast whistle, as required by the rules of navigation, to signal her change of course to the right.

With this change of course—according to the Gulfstar—the vessels involved would have passed safely had the Sun held her course. However, the latter, when the vessels had approached to within a half-mile of each other (the Sun then bearing half a point on the Gulfstar's starboard bow), altered her course to her own left; whereupon the Gulfstar swung her rudder hard right and ordered her engines full speed ahead. The maneuver was insufficient to avoid the impact, however; and, the Sun continuing toward the Gulfstar, the vessels collided port bow to port bow at an angle of about 15°.

It is necessary to discuss the testimony of the respective sets of witnesses, since it is under attack.

Witnesses for the Sun: Hodgson, second mate of the Sun; Gibson, oiler on the Sun; Van Gemmert, master of the Sun; Baldwin, ablebodied seaman and acting as quartermaster on the Sun; Miller, engineer officer on the Sun; Simmons, seaman on the Sun;

Captain Campbell, yard captain or dock master of the Ship Building and Dry Dock Company, and in command of both the Sun and Gulfstar on their trial trips; Whittaker, manager of the Marine Department of the Sperry Gyrescope Company.

Witnesses for the Gulfstar: Lindstrom, second mate of the Gulfstar; Jenkins, master of the Gulfstar; Kutch, second assistant engineer on the Gulfstar; Fisher, ordinary seaman on the Gulfstar; Creasap, marine superintendent of the Thespian Steam Ship Company.

Hodgson, for the Sun, was on watch from midnight until after the collision, and Lindstrom was on watch on the Gulfstar during the same time. Each party depends for the most part upon the testimony of its watch officer to establish its version of the collision and the events preceding it. In general, the two contrasting fact versions given hereabove are gathered from the testimony of these two witnesses.

Gibson was on watch in the engine room of the Sun. His testimony related to signals from the bridge; turning on the air to stop and reverse the engines, and putting the engines in reverse. Van Gemmert, master of the Sun, was asleep and was awakened by the collision, and testified as to the position of the vessels thereafter; as to the setting of the wheel and the going astern of the engines. He also identified the course recorder chart. Baldwin, on watch as quartermaster of the Sun in the wheelhouse at the time of the collision, testified as to the relative positions of the Sun and the Gulfstar prior thereto, and in general corroborated Hodgson's story.

Miller was engineer officer on watch on the Sun at the time of the collision. He described the engines of his ship and the activities in the engine room just prior and subsequent to the collision. Simmons, lookout on the Sun at the time of the collision, also corroborated most of Hodgson's story as to the circumstances attendant thereupon.

Captain Campbell was not on the Sun at the time of the collision; he testified as to the maneuverability of the Sun and Gulfstar, the draught of the two vessels, as to the changes in the Sun's heading as shown by the course recorder chart; he interpreted the chart generally, and from certain available data prepared a chart himself, showing the actual track of the Sun as indicated by those data.

Whittaker, a marine equipment expert, described the course recorder in use on the Sun. He did not see the collision. He also analyzed the course recorder chart, or that portion of it showing the heading of the Sun just prior to and after the collision, and testified that during the times covered by those events the chart did not record any change of course to port. Moreover, Whittaker, together with Creasap, the respondent's expert, jointly prepared an enlargement of the course recorder chart, which was offered in evidence, as well as the chart itself.

With respect to the Gulfstar witnesses:

Lindstrom's testimony has already been described. Jenkins, master of the Gulfstar, was in his cabin and did not see the collision. He did see the Sun when he looked out of a porthole after hearing the Gulfstar blow a one-blast whistle, at which time, he testified, the Gulfstar was turning slowly to starboard. He then went back to bed.

Kutch was in the engine room at the time of the collision and testified to signals from the bridge, to the shock of the collision and to the operation of the engines of the Gulfstar. He also identified the entries in the engine room rough log and the bell book.

Fisher was on watch on the Gulfstar as lookout at the time of the collision, and testified as to the course and maneuvering of the vessels prior and up to the time of the collision. He also testified to the position of the submarines to starboard of the Gulfstar.

Creasap prepared the enlargement of the course recorder chart with Whittaker, the Sun's expert. He answered hypothetical questions relating to the courses of the two vessels up to the time of the collision, and drew diagrams illustrating the relative movements and positions of the vessels premised on the data given in the hypothetical questions. He also testified in answer to another hypothetical question, that proper navigation would have dictated that a standby signal be given to turn on the air supply in the Sun's tanks, so that the engines could have been reversed more quickly than they were.

I have already mentioned the so-called course recorder chart. This consists in effect of a graph, upon which lines are drawn by a suitable device, which indicate the heading of a ship (in this case the Sun) equipped with the device, at any particular moment. Both the actual chart of the Sun

in use at the time of and preceding the collision, and an enlargement thereof made jointly by the experts of both parties, are in evidence. The Gulfstar is not equipped with such a device.

I have made no attempt to discuss all the testimony of the witnesses in detail. Suitable reference will be made to the testimony wherever necessary or material in the course of the opinion. It is the contention of each side, naturally, that the evidence of its witnesses corroborated its version of the occurrence.

Obviously, the two versions are irreconcilable. It is equally patent that if either version is true, it convicts the other ship of bad navigation. If, as the Gulfstar claims, the Sun failed to maintain her course and speed (as she should have under the international rules of navigation, since she was to the starboard of the other ship on a crossing course) while the Gulfstar was swinging to starboard to pass the stern of the Sun, then the latter both violated the rules and committed an act of negligence which was solely responsible for the collision and the subsequent damage.

If, on the other hand, the Sun's version is the true one, then the Gulfstar was inexcusably negligent in swinging to starboard after she had safely crossed the Sun's course (by a full minute, as testified to by Hodgson); she placed the Sun in extremis, and even if the Sun thereafter committed a fault in navigation (which does not necessarily follow) she would not be charged with any liability for the collision if her navigating officers still used their best judgment under the exigent circumstances.

Let it be said at the outset that, with the exception of the course recorder chart and the enlargement made jointly by the parties' experts, none of the other diagrams offered or hypothetical questions answered by either side has proved of any considerable value to me.

For example, Captain Creasap for the Gulfstar submitted various charts drawn by him illustrating the position of the vessels from hypothetical data furnished by his counsel in direct examination. The diagrams were designed to demonstrate that the collision could not have happened in the way claimed by the Sun, since it is the Gulfstar's contention that the data comprised by the hypothetical questions represented testimony of the Sun's witnesses. Considerable part of the Gulfstar's argu-

444

ment is based upon the fallacy in the Sun's version as supposedly demonstrated by Captain Creasap's diagrams and his testimony thereupon.

The point is, however, that the supposed syllogisms constituted by the diagrams suffer from the introduction of too many indeterminable variables. The latter are distances, times, speeds, courses, headings, etc. The determination of the facts involving these variable factors depend in turn upon the testimony of human witnesses. No such testimony can be precise, and neither side contends that it is precise. But in the instant case, the diagrams are of little use unless those factors are given with precision. An error in testimony which is of small magnitude when the ships involved are located at certain points in space may increase with their movements: and may increase to a point where the conclusion derived from the diagram or the movements of the ships are valueless as representing the factual picture.

Moreover, in most cases, I should say, the value of the diagram depends upon the availability of fixed coordinate axes of reference (disregarding for the time the contention of relativists that no such fixed axis exists). Naturally, none is available when one is dealing with ships in the open sea, with no land near enough to furnish a (relatively) fixed and immovable point of reference. Moreover, tides, variable winds and inevitable yaws in steering introduce more variables.

The difficulty of determining issues of fact by use of such diagrams is exemplified by contradictory judicial expression on the subject: see The Corsica, 9 Wall. 630, 19 L.Ed. 804, where the Supreme Court found diagrams useful; and United States v. Commonwealth & Dominion Line (Port Philip-Proteus), 20 F.2d 729, where the Circuit Court for the Second Circuit did not.

By the same token, Hodgson's inability to draw a diagram illustrating his version of the events possesses little significance.

In the face of two conflicting versions which are as far apart from each other as the antipodes, one is apt to find the surest guide in the determination of the truth (a) in the probabilities (The Black Diamond, 2 Cir., 273 F. 811) and (b) in any single relevant material fact less susceptible to fallibility than testimony depending upon a human recollection of facts changing from second to second. So far as the latter factor is concerned, its greater probative value is well illustrated by the scientist's use of machines and recording devices for the determination of facts in physical research—such as, for instance, galvanometers, micrometers, scales, and so on. In the instant case, I refer to the mechanical course recorder or heading recorder in use on the Sun at the time of the collision. I have already described the device. It shows that no turn to port was made by the Sun at any time relevant to the discussion here. Counsel for the Gulfstar has argued that the course recorder chart, in evidence as Exhibit 1, is not that part of the chart recording the Sun's heading at and just before the time of the collision, but from all the evidence I am satisfied that it is.

Whether or not the Sun made a left turn within the five minutes preceding the collision is the most important single factor in the Gulfstar's theory of the case. Its version of the accident and practically its entire contention that the Sun committed some fault in navigation is predicated upon such a left turn (made at some time within four or five minutes of the collision). The chart, however, shows a steady swing to starboard on the part of the Sun during those times, and I am satisfied from it that the Sun made no swing to port, as testified to by Lindstrom and other witnesses for the Gulfstar.

Now as to the probabilities. There are a number of factors which to my mind resolve any doubt as to factual questions in favor of the Sun's version.

It will be remembered that according to the Sun's witnesses, the Gulfstar, after crossing the Sun's bow, swung to starboard, but did not continue the swing: instead, she "steadied on" and headed for the Sun instead of continuing her swing to the right so as to head away from and to port of the Sun. This portion of the Sun's version of the collision is corroborated by *a witness for the Gulfstar*. The witness was Fisher, on watch as lookout for the Gulfstar at the time of the collision. He testified that after the Gulfstar had commenced her swing to starboard and had altered her course by about twenty degrees, she "steadied on the altered course"; that at that time, the Sun was approximately over the Gulfstar's bow; that for a time the Gulfstar was approaching the Sun and that the Sun was dead ahead; and that the Gulfstar continued to head toward the Sun until the latter suddenly went to her left.

It is needless to say that such testimony from one party's witness strongly corroborating the version of the other party, or a portion thereof, is a considerable factor in establishing such other party's version.

Another element tending to establish the truth of the Sun's story is the angle of the collision. The angle from all the testimony appears to be small: that it was small is borne out by the undisputed testimony that the vessels raked alongside each other after the first impact, so that their sterns were both in contact (port to port) before they separated. This raking alongside serves to corroborate the testimony that the angle of collision was small.

Now, a small angle of collision, accompanied by a raking for practically the entire length of each vessel, is more consistent with the situation where two vessels, heading in opposite directions, *and both swinging right,* collide: than when one is swinging right and the other left, as contended by the Gulfstar. As I visualize the situation, were the latter the true version, the bow of the Sun would have been more apt to come in toward the port side of the Gulfstar in a cutting rather than a flat angle. (It is undisputed and conceded that the Gulfstar was swinging right at the time of the collision.) When two vessels approaching each other are both swinging right, and are near and attempting to avoid collision, the angle of impact will tend to decrease: if one is swinging left, the angle tends to increase as the swinging continues, and there is less probability of the vessels raking alongside each other under such circumstances. What has just been said, therefore, strengthens the mute testimony of the course recorder that the Sun never made a left swing at any relevant time.

Another element touching upon the probabilities is this:

An essential phase of the Sun's theory of the case is a swing to starboard on the part of the Gulfstar about four minutes preceding the collision. This starboard swing is conceded by the Gulfstar —only the latter claims, of course, that it was made under such circumstances as justified it (i. e. the right swing was made by the Gulfstar before she crossed the course of the Sun, and for the purpose of passing under the stern of the Sun). The fact remains, however, that an action by the Gulfstar essential to the libellant's theory of the case is conceded by the respondent, although it is not, naturally, conceded that the swing was made after the Gulfstar had crossed the course of the Sun.

Further touching on the probabilities:

I have already indicated that if the version of either party is true, it follows that the other party has been guilty of very bad navigation. When one views the situation as involving only the two ships themselves, it appears almost incredible that the Sun would make a left swing as claimed by the Gulfstar, under the circumstances as they existed at the time. Such an action would appear either potentially suicidal or utterly wanton. On the other hand, it is equally incredible that in the absence of other factors the Gulfstar should have made a swing to starboard in the way and at the time claimed by the Sun. The inquiring mind, in testing the probabilities, seeks for factors which might furnish a plausible explanation for such action on the part of one vessel or the other.

So far as the Sun is concerned, I have been unable to find any extraneous factor (extraneous in the sense of some other object besides the two vessels being involved) which might explain or suggest a reason for such a maneuver as the left swing testified to by witnesses for the Gulfstar. It is true that counsel for the Gulfstar in their brief suggest that Hodgson was not even on deck at the time of the events under discussion, but the testimony is all the other way, and I cannot accept such an explanation.

On the other hand, there is a factor or circumstance which might explain the otherwise unbelievable maneuvering of the Gulfstar as testified to by the Sun's witnesses. What I refer to is the presence of the two submarines to starboard of the Gulfstar.

There is no dispute that the submarines were there. There is no dispute that the Gulfstar had overhauled the submarines very shortly prior to the time when the Gulfstar commenced her conceded swing to starboard.

The situation was then that the Gulfstar, with the Sun in sight on a crossing course and coming from her starboard (which meant that it was the duty of the Gulfstar to keep out of the way of the

Sun), knew or should have known that in persisting in overhauling the submarines she might be running into a position of danger, if she later would be compelled to make a right turn in order to pass under the stern of the Sun, since making a right turn ipso facto meant crossing the (substantially parallel) courses of the submarines. I think a proper sense of caution would have dictated a postponement of the overhauling of the submarines under such circumstances, which could have been effected by the Gulfstar's reducing her speed, or even stopping or reversing—at least until the Sun had passed beyond a point where there would be any danger in a maneuver by the Gulfstar designed to let her pass astern of the Sun without crossing the course of the submarines. However that may be, the presence of the submarines to starboard of the Gulfstar would furnish a possible explanation of or reason for the collision. In effect, when the Gulfstar was at the point of making her right swing, she had not the freedom to maneuver which she would have have had if the submarines had been absent. Their presence restricted the Gulfstar's maneuvering, in that she could not make so sharp or extensive a right turn as the requirements of prudence and safety would dictate, in order altogether to avoid the Sun. As it was, the Gulfstar had to steer a course between two vessels (the Sun on her left and the submarine S-30 on her right)— and she fell into difficulties because of the necessity for guarding against two contingencies instead of only one. It appears fairly clear to me that the Gulfstar did not swing sufficiently to starboard, and thus came too close to the Sun to prevent the subsequent collision.

This analysis of the situation is borne out by Fisher's (witness for the Gulfstar) testimony that the Gulfstar "Steadied on" after commencing her starboard swing. As a matter of fact, Lindstrom (also a witness for the Gulfstar) testified:

"Q. And will you tell us why you did not change your course more to the right? A. Because I was close—I had a submarine close on our starboard side and I did not want to change the course because I was afraid of hitting the submarine, or she might hit us."

Thus it appears that there was no single circumstance which might serve to explain an otherwise almost incredibly bad maneuver on the part of the Sun (her alleged left swing); while there is a factor in the case—the presence of the submarines—to explain why the Gulfstar did not swing sufficiently to starboard to avoid impact with the Sun.

And finally, the absence of customary entries regarding the circumstances of the collision in the Gulfstar's deck log tends to discredit the testimony of the Gulfstar witnesses with regard to points in dispute: Arkansan-Knoxville City, 1939 A.M.C. 352. The deck log fails to record the Gulfstar's change of course, whistle signals or other maneuvers.

I conclude then from the evidence of the course recorder and a consideration of the probabilities, that the Sun's version is the true one.

Both Hodgson and Lindstrom's testimony were attacked upon the ground that there was a variance between the testimony in depositions and that given by each witness before the local inspectors shortly after the collision. In this connection it is to be noted that, of course, the mere fact that prior testimony differed from that given in this case, does not necessarily prove that the prior testimony is to be chosen and the other discarded. Moreover, witnesses may vary in their testimony to some extent at different times, and even give some self-contradictory testimony, without intention to falsify. Generally speaking, I am inclined rather to accept the testimony given in the course of the litigation. As between Hodgson and Lindstrom, I should say that the testimony of the latter lacked clarity. It was confused at various times. I do not mean to impute to him any purposeful evasion or departure from the truth. He simply was at times a somewhat muddled witness. He was not before me, and in speaking of his testimony I refer to his deposition.

After all, one phase of this case is pretty clear. The Gulfstar was the burdened vessel. As such it was her duty under the rules to "keep out of the way of the other". 33 U.S.C.A. § 104, Art. 19 of the Rules of Navigation. She did not do so: I make this bald statement in view of the conclusion already reached that the Sun made no turn to the left. Prima facie, therefore, it appears that the Gulfstar was at fault. I do not intend what I have said on this score to be taken as meaning that in every case of a collision it auto-

matically follows that the burdened vessel is at fault: but I do say that under the circumstances of the instant case, where I gather from the testimony that the Sun as a privileged vessel maintained her course and speed until in extremis, the fact that a collision happened is another element tending to indicate fault on the part of the Gulfstar.

■ Respondent argues, however, that aside from the question of disputed left turn, the Sun was at fault for failing to stop and reverse her engines in time, and cites authorities to support his contention. Those authorities do not, however, govern the instant case. Only general language is cited from The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126. In The Cushing, 2 Cir., 292 F. 560, there was a failure to reverse the engines altogether—not a failure "to reverse in time". It will be remembered that in the case at bar, the Sun's engines *were* reversed. Other cases cited by the respondent hold the privileged vessel negligent for failing to reverse in time, but I am convinced from the testimony here that any failure of the Sun to reverse more promptly was not a cause contributing to the collision. Moreover, where the Gulfstar, the burdened vessel, had placed the Sun in danger by bad navigation, the navigators of the privileged vessel are not held to the exercise of perfect and impeccable conduct in their navigation: they are only held to the exercise of their best judgment, which may not necessarily turn out to have been the best course to pursue: and the failure to adopt the best policy in an absolute sense, under the circumstances such as these, when faced by danger, does not charge them with negligence in navigation: Wilson v. Pacific Mail S. S. Co. (Newport-Svea), 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651. "Moreover, if error was made in the conclusion to change the course of the Nordpol, it was an error in extremis which is not chargeable as a fault." The Nordpol (Grace Steamship Company v. Anderson), 2 Cir., 84 F.2d 3, 5. See, also, Pacific Atlantic S. S. Company v. United States, 9 Cir., 63 F.2d 414, and The Binghamton, 2 Cir., 271 F. 69.

■ Cases cited by the respondent do not stand for the proposition that a failure to reverse or stop charges the privileged vessel with fault under any circumstances. Those cases merely hold what is perfectly patent—that a privileged vessel's duty to maintain her course and speed persists only until it becomes obvious that such maintenance must result in a collision instead of avoiding one, as it was the purpose of the rule to bring about; and that even privileged vessels must take other measures to avoid collisions when necessary. Clearly, if reversing and stopping would avoid an otherwise inevitable collision, and this can be foreseen by the exercise of that degree of judgment to the exercise of which a navigator should be held even in the face of peril or extreme danger, then a failure to reverse or take other precautions might charge the privileged vessel with fault. Each case, however, depends upon its own circumstances; and when it is not established that failure to reverse within a particular time contributed to the collision, or that a navigator, even when faced by imminent danger, should nevertheless have entertained and carried through the policy of reversing, then it has not been established that the privileged vessel is at fault.

■ My final conclusion is that the Sun's version of the events in this case is the true one: that the Gulfstar was at fault, and was negligent in a way that caused the collision, and that the Sun is not chargeable with fault.

Let request for findings of fact and conclusions of law be submitted, together with a decree in proper form and in conformity with this Opinion, and including a provision for a reference to a Special Master to find damages.